J-S02036-18

2018 PA Super 185

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
   :   PENNSYLVANIA
   :
v.   :
   :
   :
ROBERT PALMER   :
   :
Appellant   :   No. 3618 EDA 2016

Appeal from the Judgment of Sentence October 28, 2016
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0010047-2015

BEFORE: BOWES, J., NICHOLS, J., and RANSOM*, J.

OPINION BY BOWES, J.:                **FILED JUNE 26, 2018**

Robert Palmer appeals from the judgment of sentence of nineteen to eighteen years incarceration imposed following his convictions for, *inter alia*, aggravated assault. We affirm.

The facts of this case read like a law school exam. A man is captured on surveillance video extending his arm in a position consistent with firing a gun. At the same time as indicated on the video, a vehicle carrying three persons arrives at an intersection near the gunman's location, and turns down a road. That vehicle is followed by two more cars. The driver of the first car, Danielle Kelsey, is struck in the back with a single bullet, causing significant injuries. No one else is hit. There is no forensic or ballistics evidence to establish the path of the bullet that struck the victim, nor are any other bullets recovered. However, police discover ten fired cartridge casings from the

_____
* Retired Senior Judge assigned to the Superior Court.

location of the gunman as indicated by the video, all of which were fired from the same weapon. The gunman is identified, arrested, and speaks to police. He asks what his bail would be if the shooting was an accident. What crimes have been committed?

## I

### Appellant's charges

The Commonwealth charged Appellant with, *inter alia*, two counts of attempted murder, and two counts of aggravated assault. The crimes identified Ms. Kelsey and John Doe as the respective victims.[1] The statutory text for those crimes reads as follows.[2] A person is guilty of criminal homicide "if he intentionally, knowingly, recklessly or negligently causes the death of another human being." 18 Pa.C.S. § 2501. A person is guilty of aggravated assault if he:

> (1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]

18 Pa.C.S. § 2702(a)(1). The aggravated assault counts were charged as lesser included offenses of attempted homicide, as those charges were

---

[1] The Commonwealth proceeded to trial on eight crimes: the aforementioned four charges, plus carrying a firearm without a license, carrying a firearm in Philadelphia, and two counts of recklessly endangering another person.

[2] Appellant's argument attaches significance to the trial court's judgment of acquittal on the attempted homicide counts. Since the intent to commit serious bodily injury is subsumed within the intent to kill, we use the terms interchangeably for ease of reference.

predicated on the same acts. **See Commonwealth v. Dale**, 836 A.2d 150, 154 (Pa.Super. 2003) ("The conviction for aggravated assault, being a lesser included offense, is supported by the same facts which support Dale's conviction for attempted murder, since the elements of aggravated assault are necessarily included in the offense of attempted murder and merge with it for sentencing purposes.").

Criminal attempt is separately codified at 18 Pa.C.S. § 901, which states, "A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime."  18 Pa.C.S. § 901(a).

Criminal attempt is a specific-intent crime.  Thus, attempted murder required a specific intent to kill.  **Commonwealth v. Robertson**, 874 A.2d 1200, 1207 (Pa.Super. 2005) ("For the Commonwealth to prevail in a conviction of criminal attempt to commit homicide, it must prove beyond a reasonable doubt that the accused with a specific intent to kill took a substantial step towards that goal.").  Furthermore, the aggravated assault statutory language includes attempt within its definition, and we therefore apply the language contained within § 901 when analyzing the sufficiency of attempted aggravated assault.  **See Commonwealth v. Fortune**, 68 A.3d 980, 984 (Pa.Super. 2013) (*en banc*) ("For aggravated assault purposes, an attempt is found where an accused who possesses the required, specific intent acts in a manner which constitutes a substantial step toward perpetrating a

serious bodily injury upon another.") (quotation marks and citation omitted).

Specific intent, in turn, is defined as follows:

> **(b) Kinds of culpability defined.—**
>
> > (1) A person acts intentionally with respect to a material element of an offense when:
> >
> > > (i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and
> > >
> > > (ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.

18 Pa.C.S. § 302.

The trial court granted Appellant's motion for judgment of acquittal at the two counts of attempted homicide. The jury convicted Appellant of the remaining six charges, and the trial court imposed an aggregate sentence of nine to eighteen years incarceration. Appellant filed a timely notice of appeal, and the trial court ordered him to file a Pa.R.A.P. 1925(b) concise statement of matters complained of on appeal. The trial court authored its opinion in response, and the matter is ready for review of Appellant's two claims:

> A. Is the evidence insufficient as a matter of law to sustain a conviction for aggravated assault, attempt to cause serious bodily injury to a John or Jane Doe, 18 Pa.C.S. § 2702(a)(1), beyond a reasonable doubt because attempt crimes require a specific intent and the Commonwealth failed to prove the requisite *men[s] rea*?
>
> B. Did the trial court err in permitting Detective Wearing to testify, over numerous objections, that the person or persons seen in the videos in the area of 17th Street and Susquehanna Avenue on July

16, 2015 at 8:12 p.m., 8:19 p.m., 8:22 p.m., 10:00 p.m., 10:27 p.m., 10:59 p.m., and 11:01 p.m., were the same person appearing in the video at the time of the shooting whereas Detective Wearing improperly offered lay opinion evidence in violation of Pa.R.E. 701 because the testimony was not helpful to the jury, was prejudicial, and intruded upon the jury's independent assessment of a video?

Appellant's brief at 4.

## II

Sufficiency of the evidence

Appellant's first claim challenges the sufficiency of the evidence supporting the aggravated assault with respect to John Doe. For purposes of sufficiency of the evidence review, it is undisputed that the Commonwealth established that Appellant was the gunman.[3] The following principles govern our review.

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

_____

[3] Appellant's defense at trial was that he was not the shooter.

*Commonwealth v. Williams*, 176 A.3d 298, 305-06 (Pa.Super. 2017) (citations and quotation marks omitted).

**A**

Specific intent, transferred intent, and inchoate crimes

The crimes at issue all required proof of specific intent. There is no dispute that firing ten bullets at a person constitutes a substantial step towards the commission of attempted homicide if directed at a particular person. The debate between the parties focuses on what Appellant was intending to do when he fired those bullets. The key point of contention revolves around the fact that the Commonwealth conceded that Appellant did not target Ms. Kelsey's vehicle, based upon his statement to police:

> [Appellant's] purposeful conduct of extending his arm in a shooting position and firing ten shots from a semi–automatic weapon into a populated street proved his intent to cause serious bodily injury to the unidentified person designated "John Doe." That is why he asked Detective Rocks what the consequences would be if shooting Ms. Kelsey was an accident.

Commonwealth's brief at 12.

The fact that the Commonwealth explicitly alleged that Appellant did not intend to hit Ms. Kelsey or her vehicle means that he did not, in the Commonwealth's view, specifically intend to kill her. Rather, Appellant had intended to kill someone else, but the Commonwealth could not identify him. The decision to charge specific intent crimes naming Ms. Kelsey as a victim despite the presence of only one purported victim is permissible under

Pennsylvania law. The dissonance is resolved by the doctrine of transferred intent.[4]

In **Commonwealth v. Thompson**, 739 A.2d 1023 (Pa. 1999), our Supreme Court held that transferred intent applies to inchoate crimes. Therein, Donovan Aitken exited his apartment along with his girlfriend and another man, Francisco Forbes. As Forbes crossed the street towards his vehicle, he observed Thompson pull out a gun and shoot in his direction. Forbes, thinking that Thompson was firing at him, ran in a zig-zag pattern to

---

[4] The doctrine is codified at 18 Pa.C.S. § 303:

**§ 303. Causal relationship between conduct and result**

. . . .

**(b) Divergence between result designed or contemplated and actual result.--**When intentionally or knowingly causing a particular result is an element of an offense, the element is not established if the actual result is not within the intent or the contemplation of the actor unless:

(1) the actual result differs from that designed or contemplated as the case may be, only in the respect that a different person or different property is injured or affected or that the injury or harm designed or contemplated would have been more serious or more extensive than that caused; or

(2) the actual result involves the same kind of injury or harm as that designed or contemplated and is not too remote or accidental in its occurrence to have a bearing on the actor's liability or on the gravity of his offense.

18 Pa.C.S. § 303(b).

avoid being shot.  As it turned out, Thompson was targeting Aitken, who fell to the ground during the melee.  Forbes then saw Thompson shoot Aitken several more times, killing him.  Thompson was convicted of, *inter alia*, first-degree homicide for killing Aitken, and attempted aggravated assault with respect to Forbes.

The theory supporting the attempted aggravated assault conviction was that Thompson's specific intent to murder Aitken transferred to Forbes, even though Forbes did not suffer serious bodily injury.  Thompson asserted that the evidence was legally insufficient, and claimed that the trial court erroneously issued a transferred intent instruction over his objection since he did not intend to cause any injury to Forbes.  Our Supreme Court disagreed:

> Appellant claims that the transferred intent instruction was not warranted because Forbes was never actually shot and because Forbes was not an intended victim. As noted above, however, in order to sustain the conviction for aggravated assault, the Commonwealth only needed to establish that appellant attempted to cause serious bodily injury.  There is no requirement that the victim actually be injured. Moreover, appellant's argument that the transferred intent instruction was not warranted because he did not intend to shoot Forbes ignores the essence of the transferred intent doctrine, that is, the person who ultimately is the victim *not be* the original intended victim. The transferred intent theory provides that if the intent to commit a crime exists, this intent can be transferred for the purpose of finding the intent element of another crime.  The evidence here demonstrated that appellant shot in the direction of Forbes even though he may have only intended to shoot Aitken. This evidence was sufficient to warrant the transferred intent instruction.

*Id*. at 1029–30 (footnote, quotation marks, and citations omitted) (emphasis in original).  Since **Thompson** sustained a conviction of attempted aggravated

assault, an inchoate crime, its analysis categorically applies to other inchoate crimes such as attempted murder.

**B**

Transferred intent – aggravated assault

Since attempted aggravated assault and attempted homicide both require specific intent, there was no legal impediment to charging two counts of each crime. An additional complexity arises, however, due to the fact that the aggravated assault crime is disjunctive. Thus, with respect to victim Ms. Kelsey, the Commonwealth could satisfy the elements of the crime by establishing, *via* transferred intent, that Appellant attempted to cause serious bodily to her, or, in the alternative, that he "caused [serious bodily] injury intentionally, knowingly or recklessly[.]" For purposes of sustaining that charge, the jury was required to answer this question: was the bullet that struck Ms. Kelsey actually meant to strike another person? If so, then the intent transfers, and the Commonwealth would not even have to establish serious bodily injury. If, on the other hand, that bullet was fired with no specific intent to hit a person, then Appellant could be found guilty based on the fact he actually caused serious bodily injury *via* reckless behavior manifesting extreme indifference to the value of human life. Appellant avers that the jury could not have determined that the bullet was meant for a person under these circumstances. **See** Appellant's brief at 16-17 ("The shooting could have occurred for any myriad of reasons - trying to stop a moving car

by shooting the tires, shooting at an attacking stray dog, target practice on a stop sign, firing warning shots, or even shooting at imagined flying monkeys during an intoxicated state.").

Appellant does not contest the sufficiency of the evidence regarding Ms. Kelsey. At this juncture, we note that the Commonwealth argued, with respect to Ms. Kelsey, that either theory applied:

> Everyone agrees it is the fundamental principle of this case that Danielle Kelsey was a completely innocent victim, that she had nothing to do with it, that Mr. Palmer was not trying to shoot her. And I have to be honest, Mr. Krouse said and he's right, we will never know who Mr. Palmer was trying to shoot that night, we won't.
>
> Ladies and gentlemen, that doesn't change what we saw and that doesn't change what happened. He's charged with shooting someone, shooting at someone and hitting Danielle Kelsey. **The reason he's responsible for Danielle Kelsey, even though he wasn't shooting at her it's transferred intent.**
>
> The Judge will instruct you on this because what it says is you don't get to miss and get one for free. Right? If Mr. Krouse is stands up [*sic*] and tries to shoot me and shoots Sam, we don't get to say, oh, but I was shooting for Mr. Krouse. It doesn't count that way. It's ridiculous, that's what we are talking about here. He is shooting at someone, we will never know who. It doesn't matter who because we know what he's doing. We know what he's trying to do. He's trying to very seriously hurt someone. He happens to very seriously hurt Danielle Kelsey. It is aggravated assault on the person Jane Doe or John Doe, we don't know. Maybe an ex-girlfriend, maybe an ex-friend, maybe a rival, I have no idea. Whoever it is he's charged with trying to shoot them and cause them serious bodily injury and he's charged with hitting Danielle Kelsey and causing her serious bodily injury. That's the standard for aggravated assault, that's what I want you to focus on. **Attempting to cause serious bodily injury and causing injury**.

- 10 -

N.T., 8/18/16, at 62-63 (emphases added).[5]

The trial court instructed the jury on both theories. *Id*. at 85-89. Accordingly, the jury could have determined that Appellant specifically intended to cause serious bodily injury to John Doe, but hit Ms. Kelsey instead. Alternatively, it could have decided that Appellant, while doubtlessly causing serious bodily injury, did so recklessly.

### III

Specific intent as applied to an unidentified victim

As in **Thompson**, the theory in this case was that Appellant's specific intent transferred to Ms. Kelsey. This case is distinguishable from **Thompson**, however, in that there is no readily identifiable victim at whom Appellant was firing. Appellant emphasizes that distinction. "[O]ne can infer that by firing a gun at a crowd of people, the intent is to hit or kill at least someone in the crowd. However, that law does not apply here where there are no facts to support the existence of a single possible human target, let alone a crowd." Appellant's brief at 19-20 (citation omitted).[6] Thus, Appellant argues that he could not possess a specific intent to cause serious bodily injury directed

_____

[5] As indicated by the last sentence, the Commonwealth referenced both types of aggravated assault with respect to Ms. Kelsey: an attempt to cause serious bodily injury *via* transferred intent, and causing actual serious bodily injury.

[6] If there is no intended victim, then the Commonwealth's theory of transferred intent as to Ms. Kelsey fails, at least in the absence of evidence that Appellant believed or hoped that a potential victim was present.

- 11 -

towards **anyone**. For the following reasons, we disagree and find that the jury could have determined that Appellant fired into a crowd of people, and, in turn, possessed the specific intent to cause serious bodily injury to someone in that crowd.

## A

### The trial court's ruling on attempted homicide

We now briefly discuss the trial court's granting of Appellant's motion of acquittal on the attempted homicide charges, since the court's remarks are significant to Appellant's argument. Appellant's brief at 18-19 ("Not only is there no evidence that the street was 'crowded,' the trial court even recognized as much when Appellant moved for a judgment of acquittal on the charge of attempted murder."). The trial court ruled as follows:

> **THE COURT**: We did have this argument at the motion to quash and at that time I disagreed and found that there was *prima fascia* [*sic*] evidence based on the ten shots. We are at a different level now. We are at a point where you would be asking this jury based on the firing of ten shots and the firing of ten shots only --
>
> **[COMMONWEALTH]**: And the location of the shots which I think is particularly significant.
>
> **THE COURT**: I didn't finish my sentence.
>
> **[COMMONWEALTH]**: I apologize.
>
> **THE COURT**: That that shows specific intent to kill. There is no intended victim here, there is no evidence of an intended victim, it could just as easily be that the shooter was shooting down the street of an empty block as it could be, or shooting randomly as it could be that there was some specific intent [to] kill some

- 12 -

person. I just find that the Commonwealth's case falls short of that.

N.T., 8/18/16, at 12-13.

If it were equally likely that Appellant was shooting down an empty street as it was he fired down a crowded street, then any conviction based on specific intent to a hit a person would be based on speculation. "When two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances, a jury must not be permitted to guess which inference it will adopt, especially when one of the two guesses may result in depriving a defendant of his life or his liberty." *Commonwealth v. Hubbard*, 372 A.2d 687, 692 (Pa. 1977) (quoting *Commonwealth v. Woong Knee New*, 47 A.2d 450, 468 (Pa. 1946)); *Commonwealth v. Johnson* 818 A.2d 514 (Pa.Super. 2003) (reversing judgment of sentence where "two opposing and mutually inconsistent inferences could be drawn from the facts presented herein").

Appellant presented this argument in his concise statement. "Is the evidence insufficient as a matter of law . . . because attempt crimes require a specific intent and in the trial court's own words, the Commonwealth presented 'no evidence of an intended victim[?]'" Concise Statement, 2/17/17, at 2. The trial court responded in its opinion as follows:

> In granting Appellant's motion for acquittal on the attempted murder charges, this Court did not state that the Commonwealth lacked sufficient evidence to prove a specific intent "to cause serious bodily injury" to someone. This Court stated that the Commonwealth lacked sufficient evidence to prove "some specific

- 13 -

intent to kill some person." Although the specific intent to kill necessarily includes the intent "to cause serious bodily injury," the reverse is not necessarily true. The "intent to kill" that is necessary to prove attempted murder is "greater" than the intent required to prove attempted aggravated assault - *i.e.*, intent to cause serious bodily injury. Thus the jury could properly find that the evidence established a specific intent to commit aggravated assault but did not establish the "greater" specific intent to kill someone.

Trial Court Opinion, 4/10/17, at 8 n.10 (emphasis added).

We disagree with the learned trial court's analysis. There is no doubt that some acts which are intended to cause serious bodily injury fall short of an intent to kill. However, the trial court did not grant the judgment of acquittal on the basis that the evidence was insufficient to find, as a matter of law, that Appellant's actions could establish an intent to inflict serious bodily injury on an unknown person, yet somehow those some acts could not establish the intent to kill that same person.[7] Rather, the trial court explicitly stated that the Commonwealth failed to produce sufficient evidence that there was any victim as a matter of **fact**.

**B**

Presence of a crowd

Appellant claims that the trial court's ruling is definitive on this point, writing:

Here, there was no person or persons present to whom specific intent could apply. The trial court even believed the block was

---

[7] We do not discern any difference between an intent to kill and an intent to inflict serious bodily injury under these facts.

- 14 -

empty. How its conclusion transformed from "empty" to "crowded" when the only change was Palmer's challenge to the conviction is confusing at best. It is also unsupported by the record. Speculation about intent cannot suffice to establish guilt. The conviction for aggravated assault on a John or Jane Doe is insufficient.

Appellant's brief at 21.

That argument claims that the trial court's ruling requires this Court to accept that Appellant was shooting at an empty street as a matter of fact to which we apply our conclusions of law. "Here, the Commonwealth did not establish the presence of a person nor that Appellant knew or incorrectly believed that someone was the target of his assault." *Id*. at 12.

We disagree, as that argument misapplies our standard of review. As the Commonwealth observes, the trial judge was not the finder of fact. We view the relevant inquiry as encompassing three separate but related questions: Could the jury find that: (1) A group of people was present; (2) Appellant fired into that group; and (3) Appellant fired into the group with the specific intent to inflict serious bodily injury?

Assessed in the light most favorable to the Commonwealth as verdict winner, the facts establish that there was a group of people and that Appellant shot in its direction. Appellant fired ten bullets towards the intersection of 17th Street, which runs north to south, and Susquehanna Avenue, which runs east to west. At the time he fired those bullets, Ms. Kelsey, who was driving two friends in her vehicle, turned left at the intersection of Susquehanna and 17th Street. Her vehicle was followed by two other cars containing more of

her friends. Approximately five seconds after making a turn onto 17th Street, she heard gunshots. N.T., 8/16/16, at 49. She heard the gunshots from behind her, and felt pain in her back shortly thereafter. These facts constitute sufficient circumstantial evidence that numerous people were present and that Appellant fired in their direction.

**C**

Firing into that group sufficiently establishes the requisite intent

Since we have determined that the jury could find that Appellant fired into a group of people, the remaining question is whether the jury could conclude that Appellant did so with the specific intent to cause serious bodily injury. We discuss the following precedents discussing closely-related circumstances: *Commonwealth v. Lopez*, 654 A.2d 1150 (Pa.Super. 1995); *Commonwealth v. Fierst*, 620 A.2d 1196 (Pa.Super. 1993); and *Commonwealth v. Jackson*, 955 A.2d 441 (Pa.Super. 2008). None is on point; however, we find that elements of these cases apply to the facts herein.

In *Lopez*, the defendant fired shots into the residence of his ex-girlfriend, which, unbeknownst to him, was unoccupied at the time. Other evidence indicated that Lopez wished to kill her. We determined that the Commonwealth established *prima facie* evidence of attempted aggravated assault. *Lopez* establishes that impossibility is not a defense. "[A] person who discharges a weapon into an empty residence can commit an aggravated assault if he possesses the requisite intent to cause serious bodily injury . . .

even though it is impossible for that person to actually cause such injury because of the absence of a person inside[.]" *Id*. at 1152. Herein, unlike *Lopez*, there is no evidence that Appellant hoped or believed that a person, let alone any particular person, was on the street.

In *Fierst,* the appellant intentionally drove into an oncoming vehicle. The case establishes that the harm need not be directed at a specific person. *Fierst* is distinguishable on the grounds that Fierst knew that there was a person inside the vehicle, even if he did not know the identities of the particular occupants.

Finally, in *Jackson*, this Court applied *Thompson*, *supra*. Therein, three police officers were investigating a shooting that occurred earlier that day. The victim of that shooting, Charles Wesley, was walking nearby. Five men, including Jackson, approached Wesley and commenced shooting. The three officers plus four other bystanders took cover. We concluded that the evidence was insufficient to sustain seven aggravated assault convictions for those seven persons.

> In his second issue, Appellant questions the sufficiency of the evidence to sustain his convictions for the aggravated assaults of Detective Waring, Officer Hood, Officer Allen, Sharee Norton, Sharron Norton, Shanya Wesley, and Gene Palmer. While Appellant admits that he intended to shoot Wesley, Appellant contends that these other persons were simply in the way. Appellant argues that the Commonwealth failed to establish that he had the specific intent to cause serious bodily injury to any of these persons, and thus, the requisite intent for his aggravated assault convictions is lacking.
>
>         . . . .

- 17 -

> [T]he evidence shows that Detective Waring, Officer Hood, Officer Allen, Sharee Norton, Sharron Norton, Shanya Wesley, and Gene Palmer were near Appellant's intended victim. The evidence also shows that Appellant fired a deadly weapon toward them. There is, however, no other evidence, in the form of circumstances, actions or words, occurring before, during, or after the shooting, that tends to demonstrate that Appellant specifically intended to inflict injury upon these particular persons. Therefore, the only circumstance in the record from which it may be inferred that Appellant had the intent to cause these persons serious bodily injury was his firing a deadly weapon in their direction. Based on the totality of the circumstances, we conclude that the evidence was insufficient to establish beyond a reasonable doubt that Appellant harbored the specific intent to cause serious bodily injury with a deadly weapon to any of these persons.

*Jackson*, *supra* at 445-48.

We nevertheless upheld the convictions based on **attempted** aggravated assault, relying on **Thompson**. "It is an established fact that Appellant specifically intended to cause serious bodily injury to Wesley with a deadly weapon. Under the doctrine, Appellant's intent in this regard is transferred to [the others]." *Id*. at 450. This case differs from **Jackson** in that there was an actual victim therein at whom the shots were directed. Additionally, in that case, the other victims were identifiable.

There is no doubt that a readily-identifiable victim is sufficient to sustain the convictions in these cases, but we are not of the view that it is a necessary component. The jury could find under the totality of the circumstances that Appellant fired into the group of people with intent to inflict serious bodily injury upon someone within that group. *See Commonwealth v. Matthew*, 909 A.2d 1254 (Pa. 2006) (applying totality of the circumstances to determine

if actions constituted aggravated assault). The most significant circumstantial evidence in this regard is the fact that Appellant fired ten bullets.

Additionally, *Lopez* establishes that the focus is on what Appellant sought to do, as neither legal impossibility nor factual impossibility are defenses. While *Lopez* is readily distinguishable in that the evidence established that Lopez clearly sought to kill a particular person, the focus must be on what Appellant failed to do as opposed to what he did do. We find that the jury could infer that Appellant hoped to or believed that he hit someone in that crowd with one or more bullets. *Fierst*. It is difficult to accept that this behavior was designed to do anything other than kill or inflict serious bodily injury, and the jury was permitted to attach significance to the natural and probable outcome of that behavior when assessing intent.[8] *See*

---

[8] A number of our cases have discussed similar circumstances in analyzing whether behavior was sufficiently reckless for purposes of establishing the **completed** crime of aggravated assault:

> [F]or the degree of recklessness contained in the aggravated assault statute to occur, the offensive act must be performed under circumstances which almost assure that injury or death will ensue. The recklessness must, therefore, be such that life threatening injury is essentially certain to occur. This state of mind is, accordingly, equivalent to that which seeks to cause injury. Examples of such behavior make the distinction clear. In *Commonwealth v. Daniels*, 467 Pa. 35, 354 A.2d 538 (1976), appellant had fired a gun into a crowd; in *Commonwealth v. Laing*, 310 Pa.Super. 105, 456 A.2d 204 (1983), appellant drove his car into a crowd, after having aimed it at an individual; in *Scofield*, the appellant drove at a pedestrian. *See also*, *Commonwealth v. Hlatky*, 426 Pa.Super.

*Commonwealth v. Fry*, 491 A.2d 843, 844-45 (Pa.Super. 1985) ("A fact finder may find that a person intends the natural and probable consequences of his actions.").

**D**

Analogous authority

Finally, we note that a number of States have adopted a "kill zone" theory. Briefly stated, the kill zone theory addresses scenarios such as *Thompson* and *Jackson* wherein an assailant specifically intends to kill a particular person, but in so doing exposes other, unintended targets to the same risk of death. That theory describes the intent as concurrent instead of transferred:

> California cases that have affirmed convictions requiring the intent to kill persons other than the primary target can be considered "kill zone" cases even though they do not employ that term. In *People v. Vang* (2001) 87 Cal.App.4th 554, 563–565, 104 Cal.Rptr.2d 704, for example, the defendants shot at two occupied houses. The Court of Appeal affirmed attempted murder charges as to everyone in both houses—11 counts—even though the

---

66, 626 A.2d 575 (1993); *Commonwealth v. Rohach*, 344 Pa.Super. 229, 496 A.2d 768 (1985). In each of these instances, the defendant could reasonably anticipate that serious bodily injury or death would be the likely and logical consequence of his actions. In each case, the consequence was ignored.

*Commonwealth v. O'Hanlon*, 653 A.2d 616, 618 (Pa. 1995). As discussed at length *supra*, the aggravated assault statute is disjunctive. We do not interpret the cases describing recklessness as applied to completed crimes of aggravated assault to foreclose the possibility that some behavior is so manifestly reckless that a jury could determine the behavior was specifically intended to commit serious bodily injury when examining the inchoate crime of attempted aggravated assault.

defendants may have targeted only one person at each house. "The jury drew a reasonable inference, in light of the placement of the shots, the number of shots, and the use of high-powered, wall-piercing weapons, that defendants harbored a specific intent to kill every living being within the residences they shot up.... The fact they could not see all of their victims did not somehow negate their express malice or intent to kill as to those victims who were present and in harm's way, but fortuitously were not killed."

This case permits—virtually compels—a similar inference. Even if the jury found that defendant primarily wanted to kill Wilson rather than Wilson's passengers, it could reasonably also have found a *concurrent* intent to kill those passengers when defendant and his cohort fired a flurry of bullets at the fleeing car and thereby created a kill zone. Such a finding fully supports attempted murder convictions as to the passengers.

**People v. Bland**, 48 P.3d 1107, 1118–19 (Ca. 2002) (footnote and some citations omitted, emphasis in original).

The "kill zone" theory thus rejects **Thompson** and the notion that transferred intent applies to inchoate crimes.[9] **But see State v. Dean**, 54

---

[9] In **Jackson**, we urged our Supreme Court to revisit the application of transferred intent to specific intent crimes. We add our voice to that request. As discussed at length *supra*, the application of transferred intent to inchoate crimes is confusing. Herein, the Commonwealth charged Appellant with specifically intending to kill Ms. Kelsey, while admitting that Appellant did not specifically intend to kill Ms. Kelsey.

In this respect, we believe that the kill zone theory may represent a more logical approach to situations such as **Thompson** and **Jackson**. Relatedly, transferred intent can still supply the necessary intent for a **completed** crime, *i.e.*, where the unintended target actually dies, and that remains true even when the actual target is murdered. **See Henry v. State**, 19 A.3d 944, 951 (Md. 2011) (rejecting notion that transferred intent is "used up" after the intended target is killed; "We agree with the Supreme Courts of California, Connecticut, and New Jersey, as well as with the above cited federal courts, that the doctrine of transferred intent is fully applicable where both the intended victim and an unintended victim are killed.")

N.E.3d 80 (Oh. 2015) (rejecting **Bland**; "We hold that the doctrine of transferred intent was properly applied to the attempted-murder charges."). Under the logic of the kill zone theory, the prosecution may only charge the inchoate crime of attempted murder for each targeted victim:

> One difference regarding intent to kill does exist between murder and attempted murder. A person who intends to kill can be guilty of the murder of each person actually killed, even if the person intended to kill only one. The same is not necessarily true regarding attempted murder. Rather, guilt of attempted murder must be judged separately as to each alleged victim. But this is true whether the alleged victim was particularly targeted or randomly chosen. As the district attorney aptly summarizes in this case, "**A defendant who intends to kill one person will be liable for multiple counts of murder where multiple victims die, but only one count of attempted murder where no one dies**." But when no one dies that person *will* be guilty of attempted murder even if he or she intended to kill a random person rather than a specific one.

**People v. Stone**, 205 P.3d 272, 278–79 (Ca. 2009) (emphasis added, quotation marks and citations omitted).

In **Stone**, the Supreme Court of California addressed a factual situation similar to the circumstances herein, in that the prosecutor, like the Commonwealth here, informed the jury that the person Stone intended to kill was unknown. "[I]n his argument to the jury, the district attorney agreed he had not proven that defendant intended specifically to kill [the victim named in the charges] rather than *someone* in the group of 10 persons." **Id**. at 277. (emphasis in original). **Stone** noted that the kill zone theory would thus not apply since that theory requires that there be a particular target. **Stone**

nevertheless concluded specific intent to kill could be found.  We find the following discussion persuasive:

> Can a person who shoots into a group of people, intending to kill one of the group, but not knowing or caring which one, be convicted of attempted murder? Yes. The mental state required for attempted murder is the intent to kill *a* human being, not a *particular* human being.
>
> . . . .
>
> Now that we consider the question, we conclude that a person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. An indiscriminate would-be killer is just as culpable as one who targets a specific person. One of **Bland's** kill zone examples involved a bomber who places a bomb on a commercial airplane intending to kill a primary target but ensuring the death of all passengers. We explained that the bomber could be convicted of the attempted murder of all the passengers.  But a terrorist who simply wants to kill as many people as possible, and does not know or care who the victims will be, can be just as guilty of attempted murder.
>
> . . . .
>
> We explained in **Bland** that difficulties can arise when deciding whether a person can be convicted of the attempted murder of an untargeted person *in addition to* the murder or attempted murder of the target, and regarding *how many* attempted murder convictions are permissible.  After all, the world contains many people a murderous assailant does not intend to kill.  But this case does not involve such difficulties. Defendant was not charged with the attempted murder of all the world, or even everyone in the group at which he fired, but only of *one* attempted murder. Whatever difficulties exist in deciding how many attempted murders a would be indiscriminate killer has committed do not exist here.

**Id**. at 274; 278 (emphases in original; quotation marks and citations omitted).

For the reasons set forth *supra*, we find that the jury could determine that Appellant was guilty of one attempted aggravated assault.  Whatever

- 23 -

difficulties there may be in deciding exactly how many attempt crimes may lie in these scenarios, that problem does not exist here.[10]  It does not matter whether Appellant's intent was generalized or specific with respect to his **target**.  It matters only that he had a specific intent to inflict serious bodily injury upon someone.  The jury could determine that he did, and Appellant's first claim fails.

## IV

We now address Appellant's second claim, which concerns the trial court's overruling his objections to testimony by Detective Wearing during the presentation of video surveillance testimony.  Appellant urges this Court to find that "the trial court allowed a detective to offer lay opinion evidence in violation of Pa.R.E. 701 regarding the identity of individuals seen in a video because it was not based upon his own perceptions, not helpful to the jury, and prejudicially altered the independent determination by the jury." Appellant's brief at 22.

> The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.

---

[10] For example, under **Thompson** the facts would presumably support, at minimum, attempt charges for the other two passengers in Ms. Kelsey's vehicle, plus the occupants of the vehicles following Ms. Kelsey.

*Commonwealth v. Akrie*, 159 A.3d 982, 986–87 (Pa.Super. 2017) (citation omitted).

Here, Appellant claims that, during trial, Detective Wearing "narrated the video" recovered from the deli and "opine[d] on the similarity and identity of the person seen in each video clip." Appellant's brief at 22. Appellant maintains that, instead, "[t]he correct method would have been to play the portion of the video showing the shooting, and have the detective describe the time, date, locations, and the directions of movements of the person seen in the video. . . . That is not what the Commonwealth did." *Id.* at 23. The Commonwealth answers that "Detective Wearing's testimony about the video . . . was not opinion evidence, but merely explained the basis for [Appellant]'s arrest, the DNA testing of the drugs, and [Appellant]'s question about what would the consequences be if the shooting were an accident."[11] Commonwealth's brief at 16. The trial court responded to the claim in its opinion as follows:

> Detective Wearing testified that he physically investigated the shooting scene and surrounding neighborhood, and obtained video footage of the area from the time of the shooting. While the jury viewed the videos, Detective Wearing placed the footage in context by describing the intersection that was videotaped, the camera locations, the location of Ms. Kelsey when she was shot, the location of the fired cartridge casings, the location of the narcotics, and the location of the "suspect" alleged to be Appellant. Defective Wearing further testified that immediately after viewing the videos on the day following the shooting, he saw

---

[11] Drugs were found near the location of the bullet casings. Appellant's DNA was discovered on the drugs.

Appellant in the shooting area and determined he was the shooter shown in the videotapes.

Overall, Detective Wearing's testimony was relevant to the jury's understanding of the timing of events shown on the videos, the location of the shooter when he fired the gun, the location of the victim (Ms. Kelsey) in relation to the shooter, and the location of Appellant's DNA in relation to where the gun was fired. *See e.g.* [*Commonwealth v. Cole*], 135 A.3d 191, 196 [(Pa. Super. 2016)] (finding that a detective's video narration "was relevant to the jury's understanding of the timing, the actors, and the location of events depicted in the video."). Detective Wearing's testimony also was relevant as an explanation to the jury of how and why the detectives developed Appellant as the prime suspect on the day after the shooting; why they compared his DNA to the DNA on the narcotics baggie recovered near the cartridge casings; and why they interviewed Appellant about the shooting and the videos.

"Once evidence is found to be relevant, it will be inadmissible only if its probative value is substantially outweighed by the danger of unfair prejudice or confusion." *Commonwealth v. McFadden*, [156 A.3d 299] (Pa. Super. []) (citations omitted here)[, *appeal denied*, 170 A.3d 993 (Pa. 2017)]. "Unfair prejudice is a tendency to suggest a decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." *Id.* (citing Pa. R.E. 403). "The trial court will be reversed only if an error in the admission of evidence contributed to the verdict." *Id.*

The core dispute in this case was not whether Appellant ever appeared on the video footage from the evening of the shooting. [Detective] Rocks testified that although Appellant denied he was shown on video shooting a gun, Appellant admitted the videos showed him earlier that evening in the shooting area. DNA evidence also placed Appellant at the location of the fired cartridge casings, and the videos themselves convincingly demonstrate that Appellant was captured on camera in several of the videos' timeframes.

The central dispute was whether it was Appellant, wearing a dark-colored jacket, who appeared on video around 11:00 p.m. when the shooting occurred. [Detective] Rocks testified that Appellant denied he was the "suspect" who allegedly shot Ms. Kelsey in the 11:00 p.m. portion of the videos, and Appellant's trial counsel

- 26 -

effectively cross-examined Detective Wearing regarding his testimony that the videos showed the "same suspect" shooting a gun. During closing arguments, defense counsel again contested that the person captured on video around 11:00 p.m., allegedly shooting a gun, was Appellant.

When viewing the testimony in its overall context, it is clear that the jury knew exactly what issue it was charged with determining; in fact the very first question from the jury was a request to view the video again. Detective Wearing did not induce a verdict on any improper basis nor did his testimony "divert the jury's attention away from its duty of weighing the evidence impartially." Pa. R.E. 403 (comment). Rather, the issue of the shooter's identity was fairly placed before the jury for its impartial determination[.]

Trial Court Opinion, 4/10/17, at 11-14 (citations to the record omitted).

We agree with the trial court's assessment of Detective Wearing's testimony and therefore must decide whether it is properly classified as opinion testimony. "Concededly, the division whether testimony constitutes fact or opinion may be difficult, for 'there is no litmus test for fact versus opinion.'" **Bucchianeri v. Equitable Gas Co.**, 491 A.2d 835, 839 (Pa.Super. 1985) (citations and internal quotation marks omitted). "Fact testimony may include opinion or inferences so long as those opinions or inferences are rationally based on the witness's perceptions and helpful to a clear understanding of his or her testimony." **Crespo v. Hughes**, 167 A.3d 168, 182 (Pa.Super. 2017).

Herein, Detective Wearing merely testified that he identified the shooter by finding and watching the video surveillance of the shooting, then examining earlier portions of the video for other instances where the suspect appeared. As the Commonwealth asserted, Detective Wearing's testimony about the

surveillance videos explained the basis for Appellant's arrest, the DNA testing of the drugs, and Appellant's question about what the consequences would be if the shooting were accidental. Thus, Detective Wearing's testimony about the videos was based upon his perception of them, placed his subsequent actions in context, and was helpful in allowing the jury to reach a clear understanding of all his testimony. **Crespo**, **supra** at 182. Hence, his fact testimony permissibly included non-expert opinions and was properly admitted.

Furthermore, we note that the videos had little relevance if Appellant was not the person appearing at the times highlighted by the Commonwealth. The jury was obviously aware that the Commonwealth believed that the person was Appellant, and it was the jury's duty to determine if the Commonwealth proved that fact beyond a reasonable doubt. The jury itself watched the videos, and was free to reach a different conclusion if it disagreed with Detective Wearing's conclusion that it was Appellant depicted on the video at specific moments in the footage. We therefore find no abuse of discretion.

Judgment of sentence affirmed.

Judge Nichols joins the opinion.

Judge Ransom files a concurring dissenting opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>6/26/18</u>