**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAMIL WILLIAMS | : | |
| | : | |
| Appellant | : | No. 2126 EDA 2022 |

Appeal from the Judgment of Sentence Entered May 26, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008261-2019

BEFORE: BENDER, P.J.E., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY BENDER, P.J.E.:          **FILED FEBRUARY 08, 2024**

Appellant, Jamil Williams, appeals from the judgment of sentence of an aggregate term of 28½ to 57 years' incarceration, imposed after a jury convicted him of aggravated assault, conspiracy, carrying a firearm without a license, and related offenses. After careful review, we affirm.

Appellant sets forth the following facts, as pertinent to the issues he raises herein:

> On April 25, 2018, outside a corner store at Eighth and Diamond Streets in Philadelphia, two individuals shot at Neil Gardner while he was selling marijuana. Philadelphia police recovered video from the scene. The video shows one shooter walk up and begin firing while Mr. Gardner runs eastbound on Diamond Street. (N.T.[,] 9/7/21[,] at 50). A second man then appears and fires additional shots. Mr. Gardner testified that he recognized the first shooter as a man by the nickname of Bucky, and that he did not see the other shooter because he was already running away after Bucky started firing. ([*Id.*] at 40-41). Mr. Gardner was not injured, and police did not file charges against anyone at the time.
>
> Over a year later, police charged [Appellant] as the second shooter after Mr. Gardner identified him from a double-blind photo

array. (N.T.[,] 9/8/21[,] at 50). Mr. Gardner and his attorney, Gwen Callen, met with detectives on May 24, 2019. Mr. Gardner was shown six photographs by Detective [Daniel] Flynn, and he circled the photo of [Appellant] as a person he knew. However, Mr. Gardner did not tell the detective that [Appellant] was the shooter - he stated only that he was 100 percent certain that he recognized the person in the photo. ([*Id.*] at 58; Certified Record p. 252 (Trial Exhibit C13a - photo array)). After Detective Flynn left the room, Detective [Sherie] Savoy entered the room. Detective Savoy had prepared the photo array and knew the identity of the suspect. Realizing that Mr. Gardner had not stated that [Appellant] was one of the people who shot at him, she asked Mr. Gardner directly, "these are the guys who did what?", after which Mr. Gardner replied, "they shot at me." ([*Id.*] at 78; Trial Exhibit C12 - video recording of photo array procedure).

At trial, Officer [Joseph] Goodwin was permitted to identify [Appellant] as the second shooter in the video. The court allowed this identification despite the fact that Officer Goodwin testified that he had never talked face to face with [Appellant], never arrested him, and had never before seen him at Eighth and Diamond Streets. (N.T.[,] 9/7/21[,] at 58-59). Officer Goodwin based his identification on "the bald head, the beard, the build, [and] the clothing." ([*Id.*] at 59). Similarly, at a pretrial hearing, Officer Goodwin based his identification on the characteristics of "a big husky guy with just a - just the size, the bald head, everything like that." (N.T.[,] 8/30/21[,] at 25). Officer Goodwin conceded that there was nothing particular about the way [Appellant] walks, he was not sure if [Appellant] had any visible tattoos, and he did not know if [Appellant] was right- or left-handed. (*Id.*)

Neil Gardner testified at trial that he knew [Appellant] in passing from around the neighborhood. (N.T.[,] 9/8/21[,] at 7). He did not identify [Appellant] as the second shooter, but said that he saw [Appellant] on the corner of Eighth and Susquehanna Streets after he ran from the shooting. ([*Id.*] at 11). On cross-examination, Mr. Gardner acknowledged that he was originally sentenced to 6 to 12 years in his own criminal case, but that sentence was reduced to 4 to 10 years after he participated in the photo array. ([*Id.*] at 36, 38). He stated that he told police at the preliminary hearing and again before trial that [Appellant] was not the shooter, and that no one had threatened him, coerced him, or offered to pay him to say this. ([*Id.*] at 41-43).

> To explain why Mr. Gardner did not testify the way the prosecution wished, the assistant district attorney read into the record a statement made by Mr. Gardner's attorney, Gwen Callan, at Mr. Gardner's sentencing proceeding. Despite repeated objections from the defense, the trial court inexplicably allowed the prosecutor to read into the record Ms. Callan's argument from Mr. Gardner's sentencing, including the statement that Mr. Gardner "specifically asked me not to call [his family]. He didn't want it to get out in the neighborhood that he's cooperating for fear about retaliation." ([*Id.*] at 33).
>
> During closing argument, the prosecutor compared [Appellant] to the character Omar from the TV series The Wire. (N.T.[,] 9/9/21[,] at 13). In The Wire, Omar Little was a "stickup man" who robbed drug dealers. The character was responsible for at least five murders during the series. https://thewire.fandom.com/wiki/Omar_Devon_Little (last accessed Mar[.] 16, 2023).

Appellant's Brief at 11-14 (some formatting altered).

At the close of trial, the jury convicted Appellant of aggravated assault (18 Pa.C.S. § 2702(a)(1)), conspiracy to commit aggravated assault (18 Pa.C.S. § 903), possession of a firearm by a person prohibited (18 Pa.C.S. § 6105(a)(1)), carrying a firearm without a license (18 Pa.C.S. § 6106(a)(1)), carrying a firearm in public in Philadelphia (18 Pa.C.S. § 6108), and possessing an instrument of crime (18 Pa.C.S. § 907(a)). On May 26, 2022, the court sentenced Appellant to the aggregate term set forth *supra*. He filed a timely post-sentence motion, which was denied. Appellant then filed a timely notice of appeal, and he complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The court filed its Rule 1925(a) opinion on December 5, 2022.

Herein, Appellant states five issues for our review:

I. Whether the trial court erred in failing to suppress the out-of-court identification of [Appellant], because Detective Savoy impermissibly suggested to the complaining witness that [Appellant] was the shooter?

II. Whether the trial court erred in allowing Officer Goodwin to offer opinion testimony at trial in which he identified [Appellant] on video as the shooter, despite Officer Goodwin['s] never having met [Appellant] personally and offering only a general description to compare [Appellant] to the shooter?

III. Whether the trial court erred in allowing the prosecutor to read a statement by the attorney for the complaining witness into the record at trial, when that statement, which argues that the complainant was afraid of retaliation from [Appellant], was made by the complainant's attorney during the complainant's sentencing in an unrelated matter?

IV. Whether the trial court erred in denying the post-sentence motion for a new trial because the prosecutor's comments in closing argument, including comparing [Appellant] to a multi-murderer from the television show The Wire, impermissibly prejudiced the jury to the extent that a new trial is required?

V. Whether the aggregate sentence of 28½ to 57 years is excessive under the circumstances and unreasonably exceeds the sentencing guidelines, which call for 84 to 102 months for aggravated assault and 90 to 102 months for possession of a firearm by a prohibited person?

Appellant's Brief at 7-8.

Appellant first contends that the court erred by denying his pretrial motion to suppress the out-of-court identification of Appellant made by Mr. Gardner from a photographic array. Appellant insists that the "identification procedure was unduly suggestive, and there was no subsequent identification that could be deemed reliable." *Id.* at 19. He stresses that the "array was performed a year after the incident" and, although it "began as a double-blind procedure administered by Detective Flynn, who did not know the suspect's

identity[,]" Mr. Gardner only stated that Appellant was the shooter after being "asked a suggestive question by Detective Savoy[,]" who "had prepared the photo array and knew the identity of the suspect." *Id.* at 19-20. Appellant argues that Detective Savoy's question – "these are the guys who did what?" – "was deliberately suggestive and designed to elicit the desired response, which was an identification of [Appellant] as the second shooter." *Id.* at 20. Because Mr. Gardner testified at trial that he could not see the second shooter and he "never made a subsequent identification of [Appellant] as the shooter[,]" Appellant claims that his "out-of-court identification should have been suppressed." *Id.*

Initially,

[w]hen reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. However, where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Fulmore*, 25 A.3d 340, 346 (Pa. Super. 2011) (citation omitted). Additionally:

Whether an out of court identification is to be suppressed as unreliable, and therefore violative of due process, is determined from the totality of the circumstances. Suggestiveness in the identification process is a factor to be considered in determining the admissibility of such evidence, but suggestiveness alone does

not warrant exclusion. Identification evidence will not be suppressed unless the facts demonstrate that the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

*Id.* (cleaned up).

Here, in explaining the basis for its decision to deny Appellant's motion to suppress Mr. Gardner's out-of-court identification, the trial court stated:

> In … *Fulmore*, the Superior Court ruled that the trial court erred in suppressing an out-of-court identification in an array lineup when a detective working the case merely used the phrase[,] "which one comes to mind[,]" while showing the victim a photo array of suspects that included the [d]efendant. Unlike in … *Fulmore*[,] where the trial court erred in suppressing the identification evidence, the trial court in [this] case was correct in not suppressing the out-of-court identification. In this case, Neil Gardner had identified [Appellant] before Detective Savoy had asked the question thereby clarifying that Mr. Gardner was identifying the one who shot at him. N.T[.,] 09/08/21[,] at 77, exhibit C-12. Further, this would not be considered suggestive because Mr. Gardner knew that he was supposed to be identifying who he thought shot at him. However, even if this were to be considered suggestive, suggestiveness alone does not warrant exclusion. In conclusion, the trial court did not err in allowing an out[-]of[-]court identification.

Trial Court Opinion (TCO), 12/5/22, at 7-8.

We discern no abuse of discretion in the court's decision. Mr. Gardner had identified Appellant in the photo array *before* he was asked the purportedly suggestive question. We also agree with the court that, because Mr. Gardner knew he was there to identify the individual(s) who shot at him, Detective Savoy's question was not unduly suggestive. Appellant additionally fails to explain why the ostensible suggestiveness of the detective's question, alone, warranted exclusion, especially where other steps were taken to ensure

the reliability of Mr. Gardner's identification. Specifically, as the Commonwealth points out,

> Mr. Gardner was interviewed using a "double blind" procedure by Daniel Flynn, a detective who did not know that defendant was a suspect. At the time, Mr. Gardner was represented by his own attorney, who was present. The event was videotaped. And after selecting [Appellant's] photo and signing his name, Mr. Gardner stated that he was "100% confident" (N.T.[,] 9/16/20, [at] 17-32).

Commonwealth's Brief at 8. Given these facts, we cannot conclude that the question asked by Detective Savoy, after Mr. Gardner had already identified Appellant in the photo array, somehow retroactively rendered the identification procedure "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Fulmore*, *supra*. Accordingly, Appellant's first issue is meritless.

Next, Appellant argues that the trial court erred by denying his pretrial motion to preclude Officer Goodwin from identifying Appellant in a video of the shooting that was played for the jury. According to Appellant, the officer admitted he "never really had any real face-to-face contact with [Appellant,]" and his identification of Appellant was premised only on the fact that the person in the video was "a big husky guy with a bald head" like Appellant. Appellant's Brief at 21, 22 (citation to the record omitted). Additionally, Appellant points out that Officer Goodwin "said at first that he recognized [Appellant's] gait[,] but then conceded that there was nothing particular about the way [Appellant] walks" that supported the officer's identification. *Id.* at 23. Appellant contends that this fact makes his case distinguishable from

*Commonwealth v. Spencer*, 639 A.2d 820 (Pa. Super. 1994), where the

Commonwealth called

> witness ... Cindy Wimer, who had known [Spencer] for approximately a year and who had observed the distinctive and easily recognized gait with which he walked. When [Spencer] walked, she said, he had a "bounce in his step ... like rolling off a step." She was shown the video tape of the robbery, and said the robber walked like Spencer.

*Id.* at 823-24. On appeal, Spencer argued that Wimer's testimony "should

have been disallowed because she was not qualified to express an opinion that

the robber's gait was similar to his." *Id.* at 824. We disagreed, concluding

that Wimer's "opinion that the gaits of the robber and [Spencer] were similar

was rationally based on her perception and was essential to a clear

understanding of her testimony. The trial court did not err by allowing the

jury to hear this testimony by the witness." *Id.*

Here, Appellant contends that,

> the testimony offered by Officer Goodwin did not meet the standard established in *Spencer*. Officer Goodwin testified that he had never actually met or talked with [Appellant]. Unlike the [witness] in *Spencer*, who knew the appellant and testified to his distinctive gait, Officer Goodwin said at first that he recognized [Appellant's] gait but then conceded that there is nothing particular about the way [Appellant] walks. Officer Goodwin offered only general characteristics - size, bald head, and beard - which are not distinctive and are shared by many people.

> Furthermore, while the parole officer in *Spencer* was allowed to use her specific knowledge of the appellant to testify that the robber in the video "looked like" the appellant, here the trial court erroneously allowed Officer Goodwin to give an opinion that the person in the video *was* [Appellant]. Because he cited only general characteristics and had never met [Appellant], Officer

Goodwin should have been precluded from making an identification from the video shown at trial.

Appellant's Brief at 23-24 (emphasis in original).

In response, the Commonwealth argues that,

[u]nder Pennsylvania law, lay opinion testimony is admissible if it is "rationally based on the perception of the witness, helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and not based on scientific, technical, or other specialized knowledge…." Pa.R.E. 701. [Officer] Goodwin satisfied that standard. As the [officer] explained, he knew that [Appellant] was the person in the video because he had seen him on an average of a few times a week while on patrol ([N.T., 8/30/21,[1] at] 20, 24). Not only did he recognize [Appellant] from his size, bald head, and beard, but [Appellant] was wearing a particular sweatsuit with lettering on the left leg in which he had been previously dressed when photographed by police conducting surveillance (*id.*[ at] 17-19).

This clearly provided an adequate foundation for admissibility, as [the suppression court] determined. ***See Commonwealth v. Palmer***, 192 A.3d 85, 101 (Pa. Super. 2018) ([finding that the] detective's testimony that he identified shooter on surveillance video was properly admissible as opinion evidence). [Appellant's] point that [Officer Goodwin] had not previously conversed with him or seen him walking with a "distinctive gait" … goes only to the weight of the evidence.

Commonwealth's Brief at 10-11.

Additionally, the trial court opined that it "did not err in allowing Officer Goodwin to offer testimony[,]" reasoning:

Officer Goodwin had familiarity with [Appellant]…, as he had seen him around the neighborhood several times. His testimony was

_____

[1] We note that the parties both refer to July 2, 2021, as the date of the suppression hearing. However, the cover page of the transcript is dated August 30, 2021, and the transcript is labeled with this date in the electronic record. Accordingly, for purposes of clarity, we will cite the August 30, 2021 date.

also helpful in determining the integrity of Neil Gardner's selection of [Appellant] from the photographic array and his in-court identification of him. Lastly, his testimony was not based on technical knowledge.

TCO at 8.

We agree with the court and the Commonwealth. Officer Goodwin's testimony was helpful for the jury to assess the credibility of Gardner's identification of Appellant as the shooter, and to explain who was shown on the video of the shooting. Moreover, as in *Spencer*, Officer Goodwin's testimony that Appellant was the individual seen in the video was not based on any technical knowledge, but on the officer's own perception of Appellant's physical features and unique clothing, based on the officer's having observed Appellant numerous times while on patrol in the area of the shooting. The fact that the officer did not identify Appellant by a specific gait of walking but, instead, identified him from his size, baldness, and distinctive clothing, does not make the officer's testimony inadmissible under *Spencer*. Rather, they are simply factors that the jury could assess in determining the weight and/or credibility to afford the officer's identification of Appellant. Therefore, the trial court did not abuse its discretion in admitting Officer Goodwin's testimony. *See Palmer*, 192 A.3d at 99 ("The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.") (citation omitted).

In Appellant's third issue, he contends that he is entitled to a new trial because "the trial judge inexplicably allowed the Assistant District Attorney to read to the jury an excerpt from an attorney's argument at sentencing in a case involving the complainant, Neil Gardner." Appellant's Brief at 24-25. Specifically, to explain why Gardner refused to identify Appellant as the second shooter at trial, the Commonwealth was permitted to read into evidence a portion of a transcript from Gardner's sentencing hearing in an unrelated case, where Gardner's attorney stated: "His family has been a big support and they have all came [*sic*] to every listing. They did not come today. He specifically asked me not to call them. He didn't want it to get out in the neighborhood that he's been cooperating for fear about retaliation." N.T. Trial, 9/8/21, at 33. Appellant now complains that "the introduction of [Gardner's] attorney's argument is not evidence at all, and it should not have been used in [Appellant's] trial in any way. Furthermore, this error was not harmless, because it allowed the prosecution to establish a reason that [Gardner] would fail to identify [Appellant] as the shooter at trial when he had previously chosen [Appellant's] photo out of a photo array." Appellant's Brief at 25.

The Commonwealth counters that, even if the at-issue statement by Gardner's attorney should not have been admitted, any such error was harmless. ***See*** Commonwealth's Brief at 12-14. We agree.

> [T]he doctrine of harmless error is a technique of appellate review designed to advance judicial economy by obviating the necessity for a retrial where the appellate court is convinced that a trial error was harmless beyond a reasonable doubt. Its purpose is premised

on the well-settled proposition that "[a] defendant is entitled to a fair trial but not a perfect one."

***Int. of J.M.G.***, 229 A.3d 571, 581 (Pa. 2020) (quoting ***Commonwealth v.***

***Allshouse***, 36 A.3d 163, 182 (Pa. 2012) (citation omitted)).

Presently, the Commonwealth correctly observes that the at-issue evidence was cumulative of Gardner's own testimony at Appellant's trial. Namely, just after the Commonwealth read the at-issue statement by Gardner's attorney at Gardner's sentencing hearing, it had the following exchange with Gardner:

> [The Commonwealth:] Am I reading that correctly?
>
> [Gardner:] Yes.
>
> [The Commonwealth:] And you also told your attorney not to let your family come in because you were scared of retaliation?
>
> [Gardner:] Yes.

N.T. Trial, 9/8/21, at 33. Therefore, even if the evidence to which Appellant now objects had not been admitted, Gardner's testimony revealed the same, exact fact to the jury, *i.e.*, that Gardner did not want his family to come to his sentencing hearing in his unrelated case because he was scared of retaliation. Moreover, we agree with the trial court that "[a]ny improper evidence of [Gardner's] attorney's words coming in are so *de minimus* that they would not have prejudiced [Appellant] nor contributed to the verdict[,]" given Gardner's out-of-court identification of Appellant as one of the two shooters, and Officer Goodwin's identification of Appellant as one of the shooters in the video of the

incident. Thus, we agree with the trial court and the Commonwealth that any error in admitting the at-issue evidence was harmless.

In Appellant's next issue, he contends that a new trial is warranted due to the prosecutor's remark, in closing argument, comparing appellant "to the character Omar form the TV series The Wire." Appellant's Brief at 26. According to Appellant, the "reference diverted the jury's attention from the facts in evidence and caused them to think about a television character who was a murderer. This caused undue prejudice to [Appellant] and warrants a new trial." *Id.* at 27.

This claim is waived. As the trial court observes, "[t]he absence of a contemporaneous objection below constitutes a waiver of [the] appellant's current claim respecting the prosecutor's closing argument." TCO at 10 (quoting **Commonwealth v. Powell**, 956 A.2d 406, 423 (Pa. 2008) (citing Pa.R.A.P. 302(a); **Commonwealth v. Butts**, 434 A.2d 1216, 1219 (Pa. 1981) (stating that the failure to object during or after summation constitutes waiver of prosecutorial misconduct claim)). Here, "counsel for the defense did not object to this statement at trial…." *Id.* at 11. Therefore, we agree with the court that Appellant's claim is waived for our review.

Finally, Appellant challenges the discretionary aspects of his sentence.

> Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right. **Commonwealth v. Sierra**, 752 A.2d 910, 912 (Pa. Super. 2000). An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:

> We conduct a four-part analysis to determine: (1) whether [the] appellant has filed a timely notice of appeal, **see** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, **see** Pa.R.Crim.P. 720; (3) whether [the] appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.[] § 9781(b).
>
> **Commonwealth v. Evans**, 901 A.2d 528, 533 (Pa. Super. 2006), *appeal denied*, … 909 A.2d 303 ([Pa.] 2006). Objections to the discretionary aspects of a sentence are generally waived if they are not raised at the sentencing hearing or in a motion to modify the sentence imposed. **Commonwealth v. Mann**, 820 A.2d 788, 794 (Pa. Super. 2003), *appeal denied*, … 831 A.2d 599 ([Pa.] 2003).
>
> The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. **Commonwealth v. Paul**, 925 A.2d 825, 828 (Pa. Super. 2007). A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." **Sierra, supra** at 912–13.

**Commonwealth v. Griffin**, 65 A.3d 932, 935 (Pa. Super. 2013) (quoting

**Commonwealth v. Moury**, 992 A.2d 162, 170 (Pa. Super. 2010)).

Instantly, Appellant filed a timely notice of appeal, and he has set forth a Rule 2119(f) statement in his appellate brief. Therein, Appellant states that the court "failed to consider any mitigation presented by the defense and did not mitigate the sentence[,] despite stating that it found a mitigating factor in [Appellant's] psychiatric issues." Appellant's Brief at 10. Additionally, he complains that "[t]he court exceeded the sentencing guidelines and mandatory minimum without proper explanation or justification, and therefore

this [C]ourt should consider the issue of an excessive and unreasonable sentence." *Id.*

Appellant did not raise either of these sentencing claims in his post-sentence motion. Therein, Appellant cursorily stated: "Each sentence, as well as the aggregate sentence of 28.5 to 57 years, far exceeds the sentencing guidelines and is unreasonable under the circumstances." Post-Sentence Motion, 6/3/22, at 1 ¶ 3. Because Appellant did not aver that the court failed to consider or apply mitigating factors in this case, or that the court did not give sufficient explanation for the sentence it imposed, these arguments are waived. *See Griffin*, 65 A.3d at 936 ("[I]ssues challenging the discretionary aspects of a sentence must be raised in a post-sentence motion or by presenting the claim to the trial court during the sentencing proceedings. Absent such efforts, an objection to a discretionary aspect of a sentence is waived.") (citation omitted).[2]

In any event, even if not waived, we would not agree with Appellant that the court abused its ample sentencing discretion.

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that

---

[2] In the Argument portion of Appellant's brief, he adds additional claims that "[t]he court … improperly stated that [Appellant] showed a lack of remorse[,]" and that the court essentially double-counted factors "already accounted for by the sentencing guidelines." Appellant's Brief at 28, 29. These claims were not raised in Appellant's post-sentence, or in his Rule 2119(f) statement. Thus, they are also waived. *Griffin*, *supra*.

- 15 -

the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Shugars*, 895 A.2d 1270, 1275 (Pa. Super. 2006).

Here, the trial court

reviewed a presentence report and mental health evaluation, as well as receiving additional input from the parties (N.T.[,] 5/26/22, [at] 21-24). Accordingly, [the court] is presumed to have been "aware of the relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Devers*, 546 A.2d 12, 18 (Pa. 1988). Indeed, the court specifically acknowledged [Appellant's] psychiatric history, difficult childhood, and the fact that he had attended drug and alcohol counseling. But as required, the court also considered the need to protect the public in light of [Appellant's] "dangerous propensities" and unfavorable prospects for rehabilitation (N.T.[,] 5/26/22, [at] 25). In this regard, [the court] emphasized that [Appellant] had indiscriminately fired a barrage of ammunition at a crowded urban location – and continu[ed] firing even when the man he had targeted was too far away to be hit (*id.*[ at] 20-21). Additionally, it noted that [Appellant] had not been deterred by his prior interactions with the criminal justice system (*id.*[ at] 22). In this regard, it should be [noted] that [Appellant] committed the instant offense while on parole from two convictions for attempted murder, after shooting one man in the kidney and another in the back.

Commonwealth's Brief at 16-17; *see also* TCO at 11 ("[T]he facts surrounding this case were that there were many pedestrians coming in and out of the grocery store at the time of the shooting, [Appellant] did not stop shooting even after Mr. Gardner was out of range, and [Appellant] was previously incarcerated for attempted murder."). We would agree with the Commonwealth that "[u]nder the circumstances, [Appellant's] sentence, which included a mandatory[-]minimum term for aggravated assault, was not

an abuse of discretion." Commonwealth's Brief at 17. Thus, even if Appellant's sentencing claims were preserved, no relief would be due.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/8/2024